D. W. JOHNSON, ET AL. *v.* MARY J. CORBETT, ET AL.

[Abstract Kentucky Law Reporter, Vol. 5—177.]

**Contract Procured by Fraud.**

Where a widow the day after the funeral of her husband and while in deep distress, being unable to read and write and without any information that she was the owner of one-third of her late husband's estate, is prevailed upon by his children, who are her stepchildren, who knew that she was the owner of such one-third interest, to sign an agreement relinquishing her interest worth about $25,000 in consideration of about $7,000, and where she was induced to enter into it by the wrongful and false representations of the children, such agreement will be set aside.

**Duty of Court to Protect the Weak.**

While a court of equity will favor the prevention of litigation by sustaining settlements made for that purpose, it will also aid the ignorant and weak against the efforts of superior minds, where improper advantage has been taken of those unable to protect themselves as to property rights.

APPEAL FROM WARREN CIRCUIT COURT.

June 9, 1883.

OPINION BY JUDGE PRYOR:

By the terms of the agreement entered into between the widow of Thomas Johnson and the appellees, who were his children and only heirs, the widow surrendered not less than $25,000 to which she was entitled by law, and accepted in lieu thereof the sum of about $7,500. The motive prompting the widow to make this sacrifice on her part, as the contract shows, was to create as little cost as possible and settle the entire estate without litigation. In order to accomplish this the widow surrenders three-fourths of her interest in the estate when the heirs or children made no sacrifice whatever.

It is sufficient to know that the marital relation existed between
Thomas Johnson and the appellant, Mrs. Corbett, and whatever may
have been her character for virtue, or her misfortunes prior to her
marriage with him, this record shows that she made him an affec-
tionate and kind wife; and while there was a great disparity between
the two in point of years, and while this fact might conduce to show
a mercenary motive on her part in marrying one so old, still her
subsequent conduct was unexceptionable, and obtained for her the
confidence and esteem of many of her neighbors.  Mere suggestions,
however, coming from the court or counsel can have no weight in
determining the legal and equitable rights of the wife.  As widow
she was entitled to one-third of the $80,000 or to one-third of what-
ever of the personal estate remained after the payment of debts and
to dower in his land, and the day after the funeral of her husband
she surrendered the whole for the sum of $7,000 or $8,000 in order
to prevent litigation.

She was told by her uncle and others that this was best as her
rights would be litigated for fifteen or twenty years, when there
could have been no question as to the nature and extent of her inter-
est in the estate.  The uncle was but the mouth-piece of the heirs,
an old and feeble man, and the widow illiterate and ignorant and in
a position where she was unable to resist the importunities of the
children.  It was agreed on the day of her husband's funeral between
the children (without even consulting the widow) that they would
give her a child's part, viz: one-tenth of the estate, and the uncle
was selected as the person to influence the widow.  She needed,
however, no influences to obtain her consent.  She was at the time
entirely subordinate to the will of the children, and some of them
were unwilling that she should have as much as a child's part.  The
children labored under the belief that she was only entitled to one-
third of the personalty for life and so did the widow and her uncle.
Long after the settlement was made and about the time the receipt
was executed in June, 1878, the widow was asking appellants' wit-
ness, Minton, if she was entitled to one-third of the estate absolutely,
and he could not inform her.  There is no doubt but that the entire
agreement was consummated on the idea by the widow at least and
possibly her uncle that she was entitled to only one-third of the estate
for life.  She had no friend or adviser and was as ignorant of busi-
ness transactions as an illiterate woman could well be, and when the

agreement had been in fact determined upon by the children on the day of the burial, and reduced to writing by the attorney for the children and presented to the widow on the next day, she had no power to resist their wishes, or the will to assert her rights even if she had known what they were.

The attorney only prepared the writing as directed by the children and consented to by her. She was not then informed that under the law she was entitled to one-third of the estate absolutely. While he stated that she was giving up one-third for a child's part, whether it was one-third for life or the absolute right was not discussed. The attorney took it for granted that this had been fully explained to the widow, or was understood by her, and while he acted in the best of faith and had no reason to doubt the propriety of the agreement entered into, the facts transpiring on the day before and followed up on the day the agreement was signed furnished undoubtable evidence of a purpose on the part of the appellants to deprive the widow of her interest in the estate. Mrs. Hurst, a daughter of the decedent, and her son give in detail (and particularly the latter) what took place on the day of the burial, and that in conversation with Proctor and others the mode of obtaining the widow's consent was agreed on. Hurst says that he knew it was morally wrong, but as each one seemed disposed to take care of his own interest he joined in with the rest. Some three or four men of business habits, and conversant with business transactions, were inducing this ignorant woman who could not even write her own name to believe that the estate would be swallowed up by litigation, and to prevent it the widow must surrender her claim to $18,000 or $20,000.

The testimony of young Hurst is attempted to be weakened from the fact that he had been sued by the estate and there was an unfriendly feeling between himself and his uncles and aunts. While a suit was brought against him it appears that he defeated the recovery, and besides his testimony is sustained by many others who have spoken in this case. It is manifest from the proof that there was a constant endeavor to keep from the widow a full knowledge of her rights, and that she was scarcely allowed to converse with any one unless some one of the children made their appearance. Beauchamp sent her word not to sign any writing, but it could not be expected that such a woman, surrounded as Mrs. Corbett was by members of the family of her deceased husband, could resist on the day after his

burial the wishes of the children. She may have expressed perfect satisfaction after this with the arrangement, but she was taken to the homes of some of the children and an unusual interest manifested in her welfare that seems never to have developed until after the death of the old man. Some of them were impressed in some way with the belief that after one year she could not attack the agreement, and the others no doubt supposed that the longer the delay in attacking the agreement the less danger there would be of canceling it.

The principal actors in obtaining this agreement knew very well the extent of the widow's interest, and that there was no cause for controversy as to what her rights were; and while a court of equity favors the prevention of litigation by sustaining settlements and compromises made for that purpose, it also lends its aid to the ignorant and weak against the efforts of superior minds where improper advantages have been taken of those unable to deal at arm's length with them in reference to the rights of property. It is attempted to be shown by D. W. Johnson, a son of the decedent, that the widow proposed to him to take a child's part, a witness to whom the widow did not speak and had been on unfriendly terms since her marriage with his father, and who was not even willing to give her a child's part, a witness whose manner and conversation over the corpse of his father, if Minton is to be believed, was such as not to commend his testimony very favorably to the consideration of the chancellor.

It is useless to analyze or discuss all of the testimony in this case, as that on the part of the appellants is directly in conflict with the testimony for the appellees, but having fully considered it, we conclude with but little hesitation that the agreement sought to be canceled was the off-spring alone of the compromise between the children on the day of their father's burial without even consulting the widow; that under the circumstances she could not resist their efforts to have it executed; that neither the agreement nor any subsequent conduct of the widow prevents her recovery in this case, but that the chancellor below acted properly in disregarding it, and placing the widow in a condition with reference to the estate as if no such contract had ever been executed.

In the case of *Black v. Black,* 11 Ky. Opin. 330, where the agreement was entered into in two months after the husband's death, this court held an agreement similar to the one under consideration in-

valid, and mainly for the reason that the widow was in deep distress and in no condition to fully understand her rights.

The judgment below is *affirmed.*

*Rodes & Settle, Wright & McElroy, Wilkins & Simms, E. W. Hines,* for appellants.

*B. F. Proctor, John M. Galloway, Wm. Lindsay,* for appellees.

[Cited, *Evans' Admr. v. Evans,* 24 Ky. L. 2421, 74 S. W. 224.]